[No. 11053.  *En Banc.*  January 28, 1914.]

THE STATE OF WASHINGTON, *on the Relation of Augustus S. Peabody, Trustee, Plaintiff,* v. THE SUPERIOR COURT FOR KING COUNTY *et al., Respondents.*[1]

EMINENT DOMAIN — BY CITIES — POWER — PROPERTY SUBJECT — STREET RAILWAYS AND FRANCHISES—STATUTES—CONSTRUCTION. Rem. & Bal. Code, § 8005, authorizing, in somewhat general terms, a city to construct and operate a municipally owned system of street railways, and in the exercise of the power, to condemn and purchase cable, electric and other railways within the limits of the city, is sufficiently broad to permit the condemnation of a street railway already devoted to the public use, as well as its franchises, although no specific mention is made of railways in active operation nor of the franchises of the railways mentioned.

SAME — PROPERTY SUBJECT — STREET RAILWAYS—LOCATION—STATUTES—CONSTRUCTION. Rem. & Bal. Code, § 8005, authorizing a city to condemn street railways within such city, authorizes the condemnation of such portions of a street railway as lie within the city limits, although the road is partly within and partly without the city and is operated as a unit, and may damage property outside the city; since it is a necessary incident of the powers granted, and since the city must make compensation for all property damaged whether within or without the city.

SAME—STREET RAILWAYS—COMPENSATION — "IN MONEY" — STATUTES—CONSTRUCTION. An ordinance providing for condemnation of parts of a street railway within the city for a municipal street railway system, and directing the board of public works to arrange and grant common user rights over the acquired track for that portion of the railway not condemned and outside of the city limits, in case the remaining portion is in suitable condition for operation after the condemned part is taken, does not violate Const., art. 1, § 16, requiring "full compensation" for property taken to be first "made in money;" especially where the common user rights to be granted are further shown not to have been intended as compensation by the proviso in the ordinance requiring such rights to be granted upon the basis and in the manner prescribed in the charter, which requires the railway company to pay for the common user rights granted by contributing a fair proportion of the cost and maintenance expense.

[1]Reported in 138 Pac. 277.

SAME. In condemnation for a municipal street railway, under such act and ordinance, the city is restricted in the granting of common user rights to the charter requirement of contribution for a fair proportion of the cost and maintenance expense; and hence could not release to the railway company common user rights over the acquired tracks, for the purpose of having the jury consider such rights in making up their award of damages.

SAME—STREET RAILWAYS — PROCEEDINGS — APPRAISAL— TENDER— SUFFICIENCY. In condemnation for a municipal street railway, it cannot be claimed that the prerequisite appraisal of the property of the street railway company sought to be condemned, and the city's offer to purchase, was in form only and not in good faith, where the railway company made no objection to the appraisal at the time of its submission, and submitted no corrected appraisal, as it was authorized to do by the ordinance.

MUNICIPAL CORPORATIONS—ORDINANCE—PUBLICATION. Seattle city charter, art. 4, § 17, providing that all ordinances shall be published at least once in the city official newspaper within three days after the same becomes a law, is directory merely, and publication within a reasonable time (six days), is a sufficient compliance.

SAME—ORDINANCES—SUBMISSION TO ELECTORS—BALLOTS. The submission of an ordinance providing for a municipal street railway for ratification by the electors is not invalidated by the fact that the proposition was not printed upon the general election ballots, as required at general elections, but upon separate ballots, where, although the election was held at the time of the general election and by the general election officers, it was in fact a specially called election, and the ballots would have been valid if the election had been held apart from the general election; especially where no legal voter was denied the right to freely express his will.

CONSTITUTIONAL LAW—OBLIGATION OF CONTRACT—DUE PROCESS— EQUAL PROTECTION OF LAWS. An act authorizing the condemnation of a street railway and its franchises (Rem. & Bal. Code, § 8005), does not impair the obligation of the contract, or deprive a person of property without due process, or deny the equal protection of the laws.

EMINENT DOMAIN—PROCEEDINGS — PARTIES — NECESSARY DEFEND-ANTS. In a proceeding to condemn, for a municipally owned street railway system, the tracks and property of a railroad company which is in the actual possession of receivers, the receivers are necessary parties defendant whose presence is essential to a valid order of condemnation.

Certiorari to review a judgment of the superior court for King county, Mitchell, J., entered February 24, 1913,

adjudging a public use and ordering an assessment of damages, in condemnation proceedings.  Reversed.

*Donworth & Todd,* for relator, contended, among other things, that there is no statute authorizing a city to take or damage a railway line outside of the city limits.  Rem. & Bal. Code, § 8005.  Statutes conferring the power of eminent domain are construed with extreme strictness and if there is any doubt of the existence of the power, it will be denied.  Lewis, Eminent Domain (3d ed.), §§ 387, 388; 6 Am. & Eng. Ency. Law (2d ed.), p. 522; *Spokane v. Colby,* 16 Wash. 610, 48 Pac. 248; *Seattle v. Fidelity Trust Co.,* 22 Wash. 154, 60 Pac. 133; *State ex rel. Attorney General v. Superior Court,* 36 Wash. 381, 78 Pac. 1011; *State ex rel. Postal Telegraph-Cable Co. v. Superior Court,* 64 Wash. 189, 116 Pac. 855; *North Coast R. Co. v. Aumiller,* 61 Wash. 271, 112 Pac. 384; *State ex rel. Wauconda Inv. Co. v. Superior Court,* 68 Wash. 660, 124 Pac. 127, Ann. Cas. 1913 E. 1076.  Wherever an entire piece of property exists, whether a tract of land or any other kind of property, the appropriation of a part constitutes a taking which affects the entire property.  2 Lewis, Eminent Domain (3d ed.), § 686; *Tacoma v. Wetherby,* 57 Wash. 295, 106 Pac. 903.  Wherever by statute certain classes of property or structures are excepted from the operation of eminent domain laws, whatever is reasonably necessary for the enjoyment of the excepted property is also deemed to be excepted.  *McCann v. Trustees of Mt. Gilead Cemetery,* 166 Ind. 573, 77 N. E. 1090.  A municipal corporation cannot usually exercise its powers beyond its own limits, and if in any case it has authority to do so, it must be derived from some statute which expressly or impliedly permits it.  *Farwell v. Seattle,* 43 Wash. 141, 86 Pac. 217; *Newberry v. Fox,* 37 Minn. 141, 33 N. W. 333, 5 Am. St. 830.  Requiring the owners of the existing railway to accept certain running rights over the tracks to be operated by the city within the city limits as partial or total compensation

for damages to that part of the railway not to be acquired by the city, is in direct conflict with the provisions of the state constitution, which requires that compensation for all property taken or damaged shall be determined by a jury and made in money. 2 Lewis, Eminent Domain (3d ed.), §§ 682, 756; *In re Smith's Petition*, 9 Wash. 85, 37 Pac. 311, 494; *Peterson v. Smith*, 6 Wash. 163, 32 Pac. 1050; *Adams County v. Dobschlag*, 19 Wash. 356, 53 Pac. 339; *Brown v. Seattle*, 5 Wash. 35, 31 Pac. 313, 32 Pac. 214, 18 L. R. A. 161; *State ex rel. Smith v. Superior Court*, 26 Wash. 278, 66 Pac. 385; *Lewis v. Seattle*, 5 Wash. 741, 32 Pac. 794; *Hansen v. Hammer*, 15 Wash. 315, 46 Pac. 332. The submission to the voters of the unauthorized requirement of the acceptance of the running rights as part of the compensation, vitiates the whole proceeding. *Metcalf v. Seattle*, 1 Wash. 297, 29 Pac. 1010; *Seymour v. Tacoma*, 6 Wash. 138, 32 Pac. 1077; *Tacoma Light & Water Co. v. Tacoma*, 13 Wash. 115, 42 Pac. 533; *Aylmore v. Seattle*, 48 Wash. 42, 92 Pac. 932. The statutes of this state do not authorize cities to appropriate by condemnation railways which are going concerns operating under franchises and thus already devoted to a public use, and thereby terminate the operation thereof by the railway companies. Rem. & Bal. Code, § 8005 (P. C. 77 § 1073). General authority in a statute to condemn does not authorize the condemnation of property already devoted to a public use, but such authority must either be conferred in express terms or must be necessarily implied from the language used. 2 Lewis, Eminent Domain (2d ed.), §§ 276, 440; Thompson, Corporations, § 5619; *Matter of City of Buffalo*, 68 N. Y. 167; *Seattle & M. R. Co. v. Bellingham Bay & E. R. Co.*, 29 Wash. 491, 69 Pac. 1107, 92 Am. St. 907; *Samish River Boom Co. v. Union Boom Co.*, 32 Wash. 586, 73 Pac. 670; *Seattle & M. R. Co. v. State*, 7 Wash. 150, 34 Pac. 551, 38 Am. St. 866, 22 L. R. A. 217; *Baltimore & O. & C. R. Co. v. North*, 103 Ind. 486, 3 N. E. 144; *Suburban Rapid-Transit Co. v. New York*, 128 N. Y. 510, 28 N. E. 525; *Cincin-*

*nati, W. & M. R. Co. v. City of Anderson,* 139 Ind. 490, 38 N. E. 167, 47 Am. St. 285; *City of Valparaiso v. Chicago & G. T. R.,* 123 Ind. 467, 24 N. E. 249; *Little Nestucca Toll-Road Co. v. Tillamook County,* 31 Ore. 1, 48 Pac. 465, 65 Am. St. 802; *Van Reipen v. Jersey City,* 58 N. J. L. 262, 33 Atl. 740; *In re Brooklyn,* 143 N. Y. 596, 38 N. E. 983, 26 L. R. A. 270. The constitution discriminates between property and franchises. Const., art. 12, § 10. The legislature in enacting the statute, carefully omitted the word "franchises." Rem. & Bal. Code, § 7768 (P. C. 171 § 31). The rule of *ejusdem generis* requires that the word "property" should be given a meaning akin or related to that of "land." *Farwell v. Seattle,* 43 Wash. 141, 86 Pac. 217. This proceeding is not maintainable for the reason that the entire property, franchises and assets of the railway company are in *custodia legis,* and were so situated at the commencement of this proceeding, being in the hands of receivers appointed by and acting for the superior court of King county. *In re Tyler,* 149 U. S. 164; *Burleigh v. Chehalis County,* 75 Fed. 873; *Chicago City R. Co. v. People ex rel. Hall,* 116 Ill. App. 633, 640; *Pacific R. Co. v. Wade,* 91 Cal. 449, 27 Pac. 768, 25 Am. St. 201, 13 L. R. A. 754; *American Loan & Trust Co. v. Central Vermont R. Co.,* 86 Fed. 390; *Tink v. Rundle,* 10 Beavan 318; 5 Thompson, Corporations, § 6379; High, Receivers (3d ed.), §§ 139, 140, 256; 1 High, Injunctions (4th ed.), §73.

*James E. Bradford* and *Howard M. Findley,* for respondents, contended, *inter alia,* that the city has the power to condemn private property *either within or without* its corporate limits for public and corporate uses. *State ex rel. Kent Lumber Co. v. Superior Court,* 35 Wash. 303, 77 Pac. 382; *Puyallup v. Lacey,* 43 Wash. 110, 86 Pac. 215. The purpose of this act was to confer additional power upon cities and enable them to acquire all existing public utilities. *Aylmore v. Seattle,* 48 Wash. 42, 92 Pac. 932; *Tacoma v. Nisqually Power*

*Co.*, 57 Wash. 420, 107 Pac. 199. The city has at least implied power to damage that part of the line outside of the city. *United States v. Gettysburg Elec. R. Co.*, 160 U. S. 668; *Farwell v. Seattle*, 43 Wash. 141, 86 Pac. 217; *In re Jackson Street*, 47 Wash. 243, 91 Pac. 970; *Tacoma v. Wetherby*, 57 Wash. 295, 106 Pac. 903. The provision with reference to running rights as embodied in the petition and ordinances pursuant to which this condemnation proceeding was instituted, is in the nature of a stipulation limiting the estate taken and permitting a joint use of the right of way by both the city and the company. 15 Cyc. 717, 718; *State ex rel. Kent Lumber Co. v. Superior Court*, 46 Wash. 516, 90 Pac. 663; *Spokane Valley Land & Water Co. v. Jones & Co.*, 53 Wash. 37, 101 Pac. 515; *Oregon R. & Nav. Co. v. Owsley*, 3 Wash. Ter. 38, 13 Pac. 186; *Tyler v. Hudson*, 147 Mass. 609, 18 N. E. 582; *St. Louis K. & N. W. R. Co. v. Clark*, 121 Mo. 169, 25 S. W. 192, 906, 26 L. R. A. 751; *Olympia Light & Power Co. v. Harris*, 58 Wash. 410, 108 Pac. 940; *Tacoma Eastern R. Co. v. Smithgall*, 58 Wash. 445, 108 Pac. 1091. The provision with reference to running rights is not such an essential element of the "system or plan" as must be first adopted by the city council and then submitted to the voters and thereby prevent the petitioner from disregarding the same and acquiring all the rights of the railway company within the city. *Tulloch v. Seattle*, 69 Wash. 178, 124 Pac. 481; *Seymour v. Tacoma*, 6 Wash. 138, 32 Pac. 1077. The act authorizes the condemnation of railways already devoted to a public use. *Tacoma v. Nisqually Power Co.*, 57 Wash. 420, 107 Pac. 199; *Brady v. Atlantic City*, 53 N. J. Eq. 440, 32 Atl. 271. The receiver was not a necessary party under the statute. Rem. & Bal. Code, § 7771 (P. C. 171 § 37); *Gasaway v. Seattle*, 52 Wash. 444, 100 Pac. 991, 21 L. R. A. (N. S.) 68; *North Coast R. Co. v. Hess*, 56 Wash. 335, 105 Pac. 853; *Carton v. Seattle*, 66 Wash. 447, 120 Pac. 111; *Silverstone v. Harn*, 66 Wash. 440, 120 Pac. 109. The failure to serve an interested party does not invalidate the pro-

ceedings as to those properly served.   23 Am. & Eng. Ency.
Law (2d ed.), p. 1044; *State ex rel. Trimble v. Superior
Court*, 31 Wash. 445, 72 Pac. 89, 66 L. R. A. 897; *Owen v.
St. Paul, M. & M. R. Co.*, 12 Wash. 313, 41 Pac. 44; *Mercantile Trust Co. v. Pittsburgh & W. R. Co.*, 29 Fed. 732.

FULLERTON, J.—This is a writ of review, sued out of
this court by the relator, Augustus S. Peabody, to review
an order of the superior court of King county, entered in
a proceeding brought by the city of Seattle to condemn, for
municipal purposes, certain of the railway property of the
Seattle, Renton & Southern Railway Company.   The relator
questions the power of the city to condemn the property
sought to be acquired, as well as the procedure pursued in
its attempted acquisition; and to an understanding of the
questions involved, a somewhat extended statement of the
matters shown in the record is necessary.

The grant of power on which the city relies to maintain
the proceedings is found in the legislative act of March 17,
1909, commonly known as the public utilities act (Laws of
1909, ch. 150, p. 580; Rem. & Bal. Code, §§ 8005-8010;
P. C. 77 §§ 1073-1083), the applicable part thereof reading
as follows:

"That any incorporated city or town within the state be,
and is hereby, authorized  .  .  .  to construct, condemn
and purchase, purchase, acquire, add to, maintain, operate
or lease cable, electric and other railways within the limits
of such city or town for the transportation of freight and
passengers above, upon or underneath the ground, with full
authority to regulate and control the use and operation
thereof, and to fix, alter, regulate and control the fares
and rates to be charged thereon;  .  .  ."

Another section of the act provides that, whenever the
city council, or other corporate authorities of any such city
or town, shall deem it advisable that the city or town of
which they are officers shall acquire the public utility above
mentioned, they shall provide therefor by ordinance, which

ordinance shall specify and adopt the system or plan proposed, and declare the estimated cost thereof, as near as may be, and the same shall be submitted for ratification or rejection to the qualified voters of the city at a general or special election.   It is also provided that, if a general indebtedness is to be incurred in the acquisition of the utility so provided for, the terms of such indebtedness shall likewise be submitted to the qualified voters at such election for ratification or rejection.   Elsewhere the statute provides a procedure for the acquiring of property necessary to be taken in order to construct and put in operation the desired utility.   It is provided that, if it is necessary to condemn land or other property for such purpose, the city shall provide therefor by ordinance, and shall cause a petition to be filed in the superior court of the county in which such city is situated, in the name of the city, praying that the just compensation to be made for the property to be taken or damaged for the purposes specified in the ordinance be ascertained by a jury, or by the court in case a jury be waived.   It is also provided that,

"Such petition shall contain a copy of said ordinance, certified by the clerk under the corporate seal, a reasonably accurate description of the lots, parcels of land and property which shall be taken or damaged, and the names of the owners and occupants thereof, and of persons having any interest therein, so far as known, to the officer filing the petition or appearing from the records in the office of the county auditor."   Rem. & Bal. Code, § 7771 (P. C. 171 § 37).

On January 9, 1911, the city council of the city of Seattle passed an ordinance adopting a system and plan for a municipally owned street railway.   Generally described, the line projected began at the southerly boundary of the city, and ran from thence in a northwesterly direction to the business section of the city, and from thence continued in a northwesterly direction to the northerly boundary thereof.   From its beginning point to the business section of the city, it follows the route of the railway owned and operated by the

Seattle, Renton & Southern Railway Company.   The ordinance specifically provides:

"Wherever any portion of the routes hereinbefore designated is found to be occupied by any existing electric railway, private owned right-of-way, track or tracks, or any of the facilities or appurtenances used in the operation of the same, and such right-of-way, tracks, facilities and appurtenances, or any of them, are in the judgment of the Board of Public Works suitable and necessary for use as part of the electric railway system or plan hereinbefore specified and adopted, the same shall be appraised at a fair and just valuation by the Board of Public Works, which shall employ expert assistance in such appraisal as may be necessary.   A similar, but separate appraisal shall likewise be made of any cars or other equipment which may then be in use for the operation of any such existing electric railway, and of any sites and structures used for housing, repairing and maintaining said equipment, so far as any such equipment, sites, or structures shall in the judgment of the Board of Public Works be suitable and necessary for use as part of the electric railway system or plan hereinbefore specified and adopted.   The result of such appraisal shall thereupon be certified to the owner of any such existing electrical railway property for his or its consideration and acceptance of said appraisal, as the amount to be paid to and accepted by said owner for conveyance of said property, or any portion thereof, before the City of Seattle shall take possession of the same.   Failure by said owner to accept said appraisal within sixty (60) days, or within said period to present a counter proposal or corrected appraisal which shall upon reconsideration be deemed satisfactory by the Board of Public Works, shall be considered as a rejection of such appraisal and a refusal to enter into any agreement for voluntary purchase and sale of such property.   In the event of such failure, rejection or refusal by said owner, the City Council may authorize the necessary proceedings to condemn and purchase, as provided by law, any or all of said property and appurtenances, together with any rights which may exist to maintain and operate the same.   These provisions for purchase, or for condemnation and purchase, of any existing electric railway property, shall not be deemed to limit the power, right or authority of the City of Seattle

to construct a new track or tracks, with all necessary facilities and appurtenances for the operation of the same as part of the electric railway system or plan hereinbefore specified and adopted, upon or along any portion of the streets which may be found occupied by any existing electric railway, if the same be not deemed by the Board of Public Works suitable or necessary for use as part of the city electric railway system or plan, or if the property cannot be purchased at the appraised or agreed valuation, or if for any reason the City Council shall not authorize the condemnation and purchase of said property. And in the event of such decision to construct a new track or tracks in any street where existing tracks are found, but not acquired or running rights thereon secured by agreement, the Board of Public Works shall prescribe the location of said new track or tracks in any such street.

"If the main portion of any existing electric railway shall be acquired and made part of the city electric railway system or plan, and there be any remaining portion of said existing electric railway in suitable condition for operating but unacquired because not included in the city system or plan, and which would be rendered less valuable, or inoperative if the same be separated from the main portion of said existing electric railway, then in any such case the Board of Public Works is authorized to arrange and grant running rights for cars to or from any such unacquired portion of such existing electric railway over any necessary city tracks; such running rights for cars to be arranged and agreed, as near as may be, upon the basis and in the manner prescribed in the city charter for use of 'common-user' tracks.

"Wherever any portion of any street hereinbefore designated for the city electric railway system or plan is found to be occupied by the track or tracks of any existing electric railway, which said track or tracks have been constructed and are being maintained under a franchise which prescribes 'common-user' provisions as to any such track or tracks, the Board of Public Works may in behalf of the City of Seattle arrange for the acquirement of running rights for city cars over any such track or tracks under the provisions for 'common-user' set forth in such franchise or fixed in the city charter; provided, however, that this shall not be held to

limit the power, right or authority of the City of Seattle to purchase, or to condemn and purchase, the whole of any such track or tracks, and any rights thereto appertaining." Seattle Ordinance No. 26,069.

The estimated cost of the construction of the railway, as recited in the ordinance, was $800,000. To raise this sum, a general indebtedness of the city was proposed; the sum to be evidenced by bonds running twenty years, and to bear interest not to exceed four and one-half per centum per annum, payable annually; such bonds to be issued, sold, and the principal and interest thereof to be paid, in conformity with the provisions of the laws of the state of Washington authorizing the issuance of bonds.

The ordinance further provided for the submission of the system and plan proposed to the voters of the city for ratification or rejection at a special election to be held in the city on March 7, 1911, the same being a day on which a general city election was to be held. It was also provided that a condensed statement of the scheme "shall be printed upon the official ballot prepared as provided by law, and that the officers of election serving at the general city election on that day should serve as officers for the special election." The proposition was submitted on the day appointed, and received the requisite number of votes necessary to adopt the same. The proposition, however, was not printed on the general election ballot in use on that day; but was printed on a separate ballot, and when returned by the voter was deposited in a separate ballot box from that in use for the deposit of the general election ballots, although the ballots were counted and the return of the count made by the general election officers.

Following the ratification of the scheme proposed by the electors of the city, the city caused its board of public works to make an appraisement of the Seattle, Renton & Southern Railway Company's property, in so far as it lay within the limits of the city, and to certify the same to the

railway company for its consideration and acceptance as the amount to be paid it for such property. The appraisement as made and tendered, however, did not place any value upon the company's franchises, but included, in separate items, its track, machinery and buildings, rolling stock and real estate, the whole being valued at $386,053.69. The railway company, by its president, replied to the tender without referring to the fact of its completeness or incompleteness, simply saying that it did not desire to sell the properties as set forth in the tender, but offered the city, in case it desired operating rights over its railway tracks, to take up and consider with the city's board of public works the amount of compensation to be paid for such rights.

The city thereupon passed another ordinance, No. 28,134, directing a condemnation of the railway company's property, in so far as it lay within the city limits. The ordinance recites the passage of the first ordinance above cited, adopting a plan and scheme for a municipally owned street railway, its submission to and ratification by the electors of the city, and its inability to agree with the owner of the railway system for its purchase. Section 1 of the ordinance describes the property sought to be obtained. The description covers the railway company's property lying within the city limits of the city of Seattle, and includes its line of tracks, its roadbed, turnouts, wyes, switches and connections; all of its poles, wires, and overhead equipments, together with all fixtures and appurtenances used in the supply, distribution and application of electric power; all of its lands lying within the city limits; its car barn and other structures, and all fixtures, machinery, tools and appliances therein contained; all of its rolling stock; and all,

"such franchises or operating rights, if any, privileges, easements and other private rights, or interests therein, if any, save as set forth in section 2 hereof, as may be possessed by said Seattle, Renton & Southern Railway Company, its successors and assigns, or any other person or cor-

poration, for the maintenance and operation of the above described line in the existing limits of the city of Seattle, together with all such other franchises or operating rights or interests therein, if any, as may be owned by the Seattle, Renton & Southern Railway Company, its successors and assigns, and persons claiming thereunder within the limits of the city of Seattle, whether tracks be laid upon the same or not."

Section 2 of the ordinance reads as follows:

"That the Board of Public Works shall arrange and grant to the Seattle, Renton & Southern Railway Company, its successors and assigns, for that remaining portion of its existing electric railway outside of the city limits, running rights for cars to or from such unacquired portion of said existing electric railway, over and upon the system hereby condemned; such running rights for cars to be arranged and granted as near as may be upon the basis and in the manner and subject to the limitations prescribed in the City Charter of the City of Seattle for use of 'common-user' tracks."

The fourth section of the ordinance authorizes and directs the corporation counsel of the city to begin and prosecute all such actions as may be necessary to "condemn, appropriate, take and damage" the property necessary to be taken and damaged to construct the railway described therein.

The common user clause of the charter of the city of Seattle relating to the granting of franchises for the construction and operation of street railways within the city, referred to in section 2 of the ordinance, reads as follows:

"Common user trackage facilities and appurtenances shall be required in all franchises on any route, to be made available for other franchise grantees and for the city itself at any time during the grant, upon contribution of a fair proportion of the cost and maintenance expense, not including any franchise valuation allowance, and if the compensation for such common user cannot be agreed voluntarily between respective grantees, or the city itself, it shall be fixed by arbitration, each party appointing one arbitrator, and if the two fail to agree, they shall appoint a third, and the result

of such arbitration shall be binding upon the parties." Seattle Charter, art. 4, § 19.

The Seattle, Renton & Southern Railway Company is a corporation organized and existing under the laws of the state of Washington. It owns a railway line extending from near the center of the business section of the city of Seattle southeasterly to the town of Renton, a distance of some thirteen miles, having a length of nine miles wholly within the city limits of the city of Seattle. In the operation of its road, no distinction is made between the parts within and without the city, but all is operated as a single unit. The corporation is a common carrier of freight and passengers, and has a gross annual income from its business of some two hundred and fifty thousand dollars. Of this sum, about 85 per centum is derived from business arising within the city of Seattle. The headquarters of the company are also located within the city, on a tract of land, known as tract 30, Morningside acre tracts, on which are located its only car barn and repair shops, which contain all of the tools and repair outfit owned by it.

The company operates its railway lines within the city of Seattle under some ten different franchises, granted it and its predecessors in interest from time to time by the city, all of which were put into the record by the corporation counsel of the city. These franchises authorize the railway company to construct, maintain and operate its line of railway over the route upon which it is now being maintained and operated; the same being principally upon the streets of the city for the first six miles of the way, measuring from the business center of the city; and for the last three miles, upon a privately acquired right of way, although it appears that the city, subsequent to the acquisition by the company of this portion of its right of way, extended one of its streets thereover. The railway has been in operation as a common carrier for freight and passengers for over twenty years.

In June, 1908, the railway company executed a mortgage, or deed of trust, to August S. Peabody, as trustee (and another who afterwards declined to act) of all of its property, to secure an issue of bonds in the maximum sum of $1,000,-000, of which bonds to the amount of $825,000 were issued and sold in the ordinary course of business. These bonds are still outstanding and unpaid.

In April, 1912, in an action brought in the superior court of King county by William E. Crawford against the Seattle, Renton & Southern Railway company and others, in which receivers were appointed over the property and effects of the corporation and since such appointment, the property of the company has been in the possession of, and operated by, the receivers.

The proceeding now in review was begun on April 30, 1912. The city originally made parties thereto the relator, Peabody, and certain persons and corporations thought to have an interest in the company's property. The corporation itself was not made a party to the proceeding originally, but was later joined as such by the order of the court. The receivers were not made parties originally, nor were they afterwards joined. The relator, Peabody, alone appeared and contested the proceedings. At the beginning of the trial, he called the attention of the court and counsel for the city to the fact that receivers appointed by the court in another proceeding were in possession of, and operating, the property at the time the present proceeding was instituted, and insisted there was a defect of parties defendant. The city, however, elected to proceed without making the receivers parties to the proceedings, and the court permitted them so to do. The trial then proceeded, and on its conclusion, the court entered the following order:

"This cause coming on to be heard on the 19th day of February, 1913, upon the application of the petitioner, The City of Seattle, for an adjudication of public use, the petitioner and the respondent Augustus S. Peabody, Trustee,

being represented in court by their respective counsel and oral and written proof having been submitted to the court, and the court having heard and considered said testimony, and having listened to the argument of counsel and being fully advised in the premises, now therefore, it is

"ORDERED, ADJUDGED AND DECREED that the contemplated use for which the private property referred to, and more particularly described in the petition herein, is sought to be taken or damaged under the laws of the State of Washington, is a public use, to wit: the condemnation, appropriation, taking and damaging of all the private railway system now operated and owned by the Seattle, Renton & Southern Railway Company within the City of Seattle, together with its railroad, rolling stock and equipment, fixtures, land, property rights and franchises, the whole being required for the purpose of or in connection with the acquisition, maintenance and operation of a municipal street railway system in the city of Seattle.

"IT IS FURTHER ORDERED that the motion of said Augustus S. Peabody, Trustee, for a dismissal of this cause on the pleadings and the proofs submitted at said hearing and his objections to the maintenance of this proceeding, be and the same are hereby overruled.

"IT IS FURTHER ORDERED that this cause be set for hearing before the court and a jury on the question of the amount of the just compensation to be ascertained herein on the 19th day of March 1913, at 9:30 o'clock A. M., unless some later day is hereafter fixed by the Court.

"To this order and the whole thereof said Augustus S. Peabody, Trustee, excepts, and said exception is allowed.

"Done in open court this 24th day of February, 1913."

It is the relator's first contention that the act of the legislature under which the city is proceeding is not sufficiently broad to permit the condemnation and purchase by the city, for a municipally owned street railway, of a street railway owned by a corporation which is already devoting the property to a public use. Attention is called to the rule of law that a statute conferring general authority to condemn does not authorize such condemnation, but that such authority must be either expressly conferred, or must be necessarily

implied from the language used in the grant of power. Attention is also called to the fact that the statute does not mention the franchises of the existing railway, and it is argued with much force, from the general rule of law and from the fact of this omission, that under the statute of this state there is neither an express nor an implied grant of such power.

The material part of the statute thought to confer the power, we have set forth in the statement. It has seemed to us that it is sufficiently broad for the purposes intended. It confers upon the city the authority to construct and operate a municipally owned system of street railways. In the exercise of the power it may "condemn and purchase . . . cable, electric and other railways within the limits of such city . . . with full authority to regulate and control the use and operation thereof; . . ." True the terms of the statute are somewhat general. There is no specific mention of railways in active operation, nor are the franchises of such railways mentioned. But the terms used, being general, are sufficiently broad to include such railways and their franchises, and since there is no specific exception of railways of the class mentioned, or of the franchises under which they operate, we think it must follow that the statute was intended to include them. A grant of power by the legislative branch of the government, if it is to meet the exigency of all cases, must of necessity be general in its terms. To particularize is to limit its scope. And here, since the power is given to condemn and purchase cable, electric and other railways generally, we think it must be held rather to include all that the terms imply than that specific exceptions were intended. The power to condemn a railway includes the power to condemn all that pertain to the railway —its operating rights, its franchises, as well as any other property pertaining thereto.

We shall not review the authorities cited by the relator to

20—77 WASH.

maintain his position. It seems to us that the general question is concluded by our own case of *Tacoma v. Nisqually Power Co.*, 57 Wash. 420, 107 Pac. 199. That was a proceeding instituted by the city of Tacoma to condemn and appropriate certain lands and water rights, lying along the Nisqually river, for the purpose of generating electric power for the use of the city. It was objected that the property sought to be condemned was already devoted to a similar public use by its then owners, and that the statute did not authorize the condemnation of property so employed. The statute authorizing the condemnation is similar in its terms to the statute before us, and the court, after quoting its language, used the following language:

"It would seem that, in the employment of such language, it was the intention of the legislature to expressly grant the power of condemnation of property devoted to a public use. Otherwise there could be no meaning to the words 'condemn and purchase,' 'works, plants and facilities.' The legislature, having in mind, in many of our cities, works, plants and facilities were in use furnishing such cities with heat, power, water, and lights, sought to confer upon cities the right to acquire such plants by either purchase or condemnation. Certainly if it is not an express grant, it is at least a necessary implication. Otherwise the language could be given no force or effect whatever. The whole tenor of the act is a manifest intention to confer upon cities the right to acquire all existing public utilities, either by condemnation or purchase, or to construct their own plants for such purposes."

We are aware that the relator argues that this question was not before the court, and that its expression of opinion thereon is no more than dictum. It is true that, in the course of the opinion, the court did say that the property sought to be condemned was not then devoted to a public use, and that there was no assurance that it ever would be so devoted, except as such assurance might be gathered from the various resolutions of the owner's board of trustees. But the court also said that it did not wish to rest the decision

on that ground; that there was a broader and more compre-
hensive ground on which the decision could rest, and it then
proceeded to discuss and decide the claim of want of power.
The case is, therefore, direct authority on the question here
involved.

It is further contended, in this connection, that the act in
question, conceding it to authorize the condemnation of a
railway within the limits of the city of Seattle, is inapplicable
to the conditions here presented, and cannot be invoked to
condemn the road of the Seattle, Renton & Southern Railway
Company. The argument is that the act confines the right
of condemnation to railways which are within the limits of
the city; that the road here in question is a unit, and oper-
ated as such; that it lies partly within and partly without
the city; and that, to take from it the portion lying within
the city limits, must necessarily damage, if it will not wholly
destroy, the remaining portion of the road; and since the
statute in express terms limits the right of a city to condemn
such railways only as lie within the limits of the city, there
is no authority to damage or destroy railways without its
limits.

But, in our opinion, this construction of the statute is not
warranted. As we view the statute, it authorizes the con-
demnation and purchase by the city of all street railways
constructed within its limits; and if this be true, the power
is not to be taken away because such condemnation and pur-
chase may incidentally damage property without its limits.
It is a general rule that an express grant of power carries
with it all incidental powers necessary to render operative
such express grant, and the rule, we think, is applicable to
the case before us. If the power is not found in the express
words of the grant, it arises therefrom by necessary implica-
tion. The city, must, of course, compensate the owner of
the property for all the property taken, and for such dam-
ages as may be done to its property not taken, whether
within or without the city limits; but clearly it would be

contrary to the purport and intent of the statute to deny to the city the right to exercise the power conferred because, by so doing, it may damage property outside of its limits.

By a reference to the ordinance submitting the scheme for a municipally owned railway to the electors of the city of Seattle, it will be observed that it contains a clause to the effect that, if the main portion of any existing electric railway shall be acquired and made a part of the city electric railway system or plan, and there be any remaining portion of such existing electric railway in suitable condition for operating but unacquired because not included in the city system or plan, and which would be rendered less valuable or inoperative if the same be separated from the main portion of such existing electric railway, then in such case the board of public works of the city is authorized to arrange and grant running rights for cars to or from any such unacquired portion of such existing electric railway over any necessary city tracks; such running rights for cars to be arranged and agreed, as near as may be, upon the basis and in the manner prescribed in the city charter for the use of common user tracks. The provision of the city charter relating to common user rights we have heretofore quoted. Section 1 of the ordinance directing the condemnation to be made, it will be observed, provides for the condemnation of "all such franchises or operating rights if any, privileges, easements, and other private rights or interests therein, if any, save as set forth in section 2 hereof" of the railways necessary to be taken for the establishment of the proposed municipal railway. Section 2 of the ordinance we have also quoted. In substance, the section provides that the board of public works of the city shall arrange and grant to the Seattle, Renton & Southern Railway Company "for that remaining portion of its existing electric railway outside the city limits," running rights over the portion condemned; such rights to be granted as "near as may be upon the basis and in the manner and subject to the limitations" prescribed

in the provision of the ordinance before quoted directing the submission of the scheme to the electors of the city.

The appellant contends that the city is, by this proceeding, attempting to compensate the railway company in part for the property proposed to be taken and damaged in the condemnation proceedings by granting it certain property rights, whether it desires to accept them or not, in violation of art. 1, § 16, of the state constitution, which provides that "full compensation" for property so taken shall be "made in money." But it has seemed to us that this is hardly a permissible interpretation of the ordinances, or of the procedure of the city thereunder. By an examination of the ordinance ratified by the electors, which must measure the city's authority for its subsequent proceedings, it will be observed that the city is authorized to arrange and grant running rights for cars over the acquired tracks only in case there may be a remaining portion of an existing railway in suitable condition for operation after the part condemned is taken away, and that these rights are to be granted as near as may be upon the basis and in the manner prescribed in the city charter providing for common user rights. It will be observed, further, that the charter provision is made operative only as between holders of franchises granted to private individuals or companies, and does not have relation to municipally owned railways; in other words, the charter provision requires that private holders of franchises for street railways shall grant to each other common user rights, it does not require that the city, in the case that it shall construct and operate a municipally owned street railway, shall grant to other street railway companies common user rights over its tracks. It would seem, therefore, that this proviso, as adopted by the electors, could have no greater effect than to place the Seattle, Renton & Southern Railway Company on the same plane with reference to the city's proposed municipally owned railway that it now occupies with reference to privately owned street railways operated under

franchises granted by the city. The electors have simply required the city to do what has been heretofore required of other street railway companies. That it could not have been intended as part compensation for the property and property rights taken and damaged, is further evidenced by the fact that the railway company whose property is proposed to be taken is required to pay for the privilege granted—it must still make "contribution of a fair proportion of the cost and maintenance expense." Nor does it seem to us that the condemnation ordinance does more. Section 2 of that ordinance, when read in the light of the proviso of the ordinance adopted by the electors, merely names the branch of the city government which shall have authority to put the scheme into effect. This is the interpretation the city, at the time of the condemnation proceedings now in review, placed upon the ordinances. At or prior to the time of that hearing, the city had not, either through its board of public works or otherwise, made any tender to the railway company of running rights. It sought to condemn, and obtained a judgment condemning, "all of the private railway system now operated and owned by the Seattle, Renton & Soutern Railway Company within the city of Seattle, together with its railroad, rolling stock and equipment, fixtures, land, property rights and franchises, the whole being required for the purpose of or in connection with the acquisition, maintenance and operation of a municipal street railway system in the city of Seattle." For the property thus sought to be taken, and for the damages the taking may cause to the remaining property of the owner, it must pay in money before it takes it. It can do neither more nor less by the terms of the ordinances under which it is proceeding, nor by the express provisions of the state constitution. A private corporation having only its individual interests to consider may change its schemes from time to time as suits its convenience, but the city officers have no such authority with reference to the public business. They must pursue powers granted them

in accordance with the grant, and any substantial departure therefrom renders these proceedings a nullity. They must pursue the powers here conferred in substantial accord with their terms, and, as we have said, they have thus far so pursued them. There is, therefore, on the face of the record, no ground for the contention that the city proposes to make compensation for the property taken other than in money.

We are aware that counsel for the city take a position in their brief with reference to the construction of these ordinances somewhat different from that which we have here taken. They argue that the city's board of public works may, at the time of the trial, release to the owners of the railway condemned running rights over the acquired railway tracks, and that the jury may consider such rights in making up their verdict as to the amount of damages that will be suffered by such owners by reason of the taking. But, as we have shown, the board of public works have no authority to tender anything not authorized by the ordinances under which the city is proceeding, and that these do no more than authorize the board to contract on behalf of the city for running rights in accordance with the terms of the city charter, which provides for running rights only upon a compensation being paid for the privilege. If such be not the meaning of the ordinances then they are clearly inimical to the constitutional provision prohibiting the making of compensation for property taken other than in money. It is true this court has said that a party condemning may take less than the whole of a given property, and that the compensation need be made for the part taken only, but such is not the present case. Here the city, by its ordinances providing for the condemnation, and by the judgment of condemnation entered, provided for the taking of the entire property of the railway company within the city limits. The whole of the property is taken, not a part merely, and the part taken fixes the measure of the compensation. The amount of such compensation cannot be lessened by a tender of something

the railway may not want, and which it must pay for if accepted.

It is next argued that the scheme or plan proposed by the ordinance for taking the property sought to be condemned has not been substantially followed by the city officers. It will be remembered that the ordinance submitted to the electors contains a condition to the effect that, before condemnation proceedings shall be begun for the acquisition of an existing railway, an appraisal shall be made of its property by the board of public works of the city and the appraisal submitted to the owners of such property for acceptance or rejection. The argument is that this provision of the ordinance was complied with in form only, and not in good faith, or in accordance with its purpose and intent. But this objection, we think, does not require an extended answer. The representative of the railway company to whom the tender was submitted made no objection to the appraisal on this ground at the time of its submission to him. On the contrary, he answered saying that the property was not for sale, and made a counter proposition to the effect that the company was willing to enter into negotiations with the city looking to an agreement by which the city could acquire running rights over the company's tracks. The ordinance, it will be remembered, provided that the company might submit a counter proposal, or a corrected appraisal, to the city's board of public works, if it so desired; and clearly, after having submitted a counter proposal, and failing to submit a corrected appraisal, it cannot now complain of the good faith of the city.

The Seattle charter (art. 4, § 17) provides that "all ordinances . . . shall be published at least once in the city official newspaper within three days after the same shall become a law." The ordinance authorizing the condemnation proceedings relied upon in this instance was passed and became a law on October 13, 1911, and was published for the first time on October 19, 1911. It is contended that the

ordinance is void because of this failure to comply strictly with the terms of the city charter. But the requirements of the city charter with reference to the publication of ordinances is directory, in so far as the time in which they must be published is concerned. The purpose of requiring that they be published is to inform the general public of their contents, and it is a sufficient compliance with the requirement that they be published within a reasonable time.

It is further contended that the ordinance providing the scheme and plan for the proposed municipally owned railway was not legally submitted to the electors of the city. This contention is based on the fact that the condensed statement of the proposition submitted was not printed upon the election ballot used at the general election held upon that day, but was printed on a separate ballot, as if at a special election called for that purpose alone. Citations are made to the statutes relating to the form of ballots required at a general election, and it is argued that these statutes require that all questions authorized by law to be submitted at an election must be printed upon a single ballot, and also that these provisions of the statute required that the proposition submitted in this instance be printed upon the general ballot in use upon that day. Had the proposition been so printed, we have no doubt that the form of the submission would have been valid, but we think it by no means follows that the form adopted in the present instance was invalid. This was a special election called for the purpose of submitting this particular question. True, it was called at the time of the general election, and the general election officers were selected as officers of the special election; but it was, nevertheless, a special election, and the laws relating to the form of the ballot at a general election are not mandatory. Ballots in the form here used would have been valid without question had the proposition been submitted at a special election held apart from the general election, and we think the form valid here. There is no claim that any legal

voter was by this form of proceeding denied the right. to freely express his will upon the question submitted. The statutes governing the proceeding are not clearly defined. The rule of procedure must be gathered from their general trend, rather than from specific enactments. In such cases,

"Courts are, and of right ought to be, reluctant to defeat the fair expression of the popular will manifested by the voters at an election the express and only object of which is to ascertain the popular will, and such expression will be upheld and made effective unless the law which defeats it is so plain and unequivocal that it is susceptible of but one construction." *Fox v. Seattle*, 43 Wash. 74, 86 Pac. 379, 117 Am. St. 1037.

It may be well to add that the validity of this election was upheld by us in *Tulloch v. Seattle*, 69 Wash. 178, 124 Pac. 481, where the validity of the bonds issued pursuant to this election was upheld, although the precise question here suggested was not there specifically suggested or passed upon.

It is next objected that the ordinances are in violation of those clauses in the Federal constitution which prohibit states from passing laws impairing the obligation of contracts, or depriving persons of life, liberty and property without due process of law, and denying to persons within its jurisdiction the full protection of the laws. It is urged that the franchises of the railway company whose property is sought to be condemned are contracts, and that it is not due process of law, and is depriving the company of the equal protection of the laws to compensate for property taken other than in money. But we have no doubt that it is within the power of the legislature to provide for the condemnation of railroad franchises granted by the state; and as we have said, the city has not, as yet, in so far as this record discloses, sought to compensate the appellant for the property proposed to be taken other than in money.

Finally, it is objected that there is a defect of parties to the proceedings. This objection we think is well taken. At the time the proceedings were commenced the property of

the railroad company was in the hands of receivers and no leave to sue them was obtained, nor were they made parties to the proceedings. The statute relating to parties specifically requires that the owners and occupants of property sought to be condemned shall be made parties, and clearly these receivers were occupants of this property at the time these proceedings were begun. Their presence was necessary, therefore, to a valid order of condemnation, and the proceedings are fatally defective without them. We have not overlooked the respondents' argument that a proceeding in condemnation is a proceeding *in rem*, and that this court has held that persons having liens upon the property are not necessary parties unless the statute makes them so. But these receivers are not mere lien holders. They were in actual possession of the property, were occupants thereof, and by statute are necessary parties. The cases of *Gasaway v. Seattle*, 52 Wash. 444, 100 Pac. 991, 21 L. R. A. (N. S.) 68; and *North Coast R. Co. v. Hess*, 56 Wash. 335, 105 Pac. 853, cited by the respondents do not sustain a contrary view. In the first case, it was inferentially, if not expressly, held that parties holding interests required by the statute to be made parties to the proceedings were necessary parties without whom condemnation could not be had; and in the second case, the parties then thought necessary were mere lien holders, whom the statute did not direct should be made parties.

The conclusion reached on the last point discussed requires a reversal of the judgment. It is not required, however, that a dismissal of the proceeding be directed, as the city may be able to obtain leave of the court which appointed the receivers to make them parties to the proceedings. The judgment of this court will be, therefore, that the order of condemnation under review be reversed, and the proceedings remanded to the lower court with instructions to grant to the city a reasonable time within which to make parties to the proceedings the receivers in possession and occupancy

of the property, and such other persons as it may deem necessary, and proceed with a further hearing in due course.

CROW, C. J., MAIN, ELLIS, and PARKER, JJ., concur.