**PUGET SOUND POWER & LIGHT CO. et al. v. PUBLIC UTILITY DIST. NO. 1 OF WHATCOM COUNTY.**

No. 9701.

Circuit Court of Appeals, Ninth Circuit.

Oct. 24, 1941.

Todd, Holman, Sprague & Allen, Lowell P. Mickelwait, and Fred J. Schaaf, all of Seattle, Wash., and Joseph W. Kindall, of Bellingham, Wash., for appellants.

Brown & Millhouse, of Bellingham, Wash., Houghton, Cluck & Coughlin, of Seattle, Wash., and E. K. Murray, of Tacoma, Wash., for appellee.

Before GARRECHT, HANEY, and STEPHENS, Circuit Judges.

HANEY, Circuit Judge.

Reversal of a decree adjudicating that the taking by appellee of certain properties belonging to Puget Sound Power & Light Company is a "public necessity" and for a "public use", and reversal of a judgment of $5,000,000 found by the jury to be just compensation for the taking, are sought by appellants.

Establishment of public utility districts to conserve the water and power resources of the State of Washington for the benefit of the people thereof, and to supply public utility service, including water and electricity for all uses is authorized by 11 Rem.Rev.Statutes of Wash. §§ 11605–11616. The districts are municipal corporations (§ 11606) and are created in accordance with the votes of the electors. §§ 11607–11609. § 11610 provides in part:

"All public utility districts organized under the provisions of this act shall have power: * * *

"(b) To * * * condemn and purchase * * * plants, plant facilities and systems for generating electric energy by water power, steam or other methods * * * and to exercise the right of eminent domain * * * and such right of eminent domain shall be exercised and instituted pursuant to resolution of the commission and conducted in the same manner and by the same procedure as is or may be provided by law for the exercise of the power of eminent domain by incorporated cities and towns of the State of Washington in the acquisition of like property and property rights. * * *"

Appellee was created pursuant to the votes of electors in 1936. On April 17, 1939, the Commission of appellee adopted Resolution No. 24, wherein it was provided that the "public interest, welfare, convenience and necessity require the establishment by the District of a public utility * * *" The resolution also specified and adopted, for such purpose, the plan of acquiring "by purchase or condemnation" the properties in question. On the same day the Commission adopted Resolution No. 25, authorizing attorneys to institute and prosecute an action to acquire the desired properties by condemnation, and also adopted Resolution No. 26 specifically describing the properties sought.

Appellant, Puget Sound Power & Light Company, hereafter called the company, is a Massachusetts corporation. The other appellant is the mortgagee of the properties in question. The company's present unified or integrated system of generating, transmission and distribution facilities, is the result of nearly 50 years of development of the electric industry in Western Washington. During that period, the company has become the successor in the operations of 148 predecessor corporations. The company's entire system extends into and serves all or part of 19 counties in Central and Western Washington. It distributes electricity over approximately 4,300 square miles of territory. It has 13 hydro-electric generating plants with a capacity of 202,000 kilowatts and 3 steam plants with a capacity of 104,500 kilowatts, the energy being transmitted over 1,538 miles of transmission lines, and distributed over 8,900 miles of distribution lines to more than 190,000 customers.

The company operates in Whatcom County, the boundaries of which are also the boundaries of appellee district. The properties sought by appellee lie in Whatcom County with the exception of two transmission lines extending to substations in Skagit County, and include the entire electric distribution system of the company in the former county, and a small hydro-electric plant of 1750 kilowatts capacity. The properties sought to be taken by appellee serve about 9% of the total customers of the company in all operations, or 17,600, but the only generating system to be taken has sufficient capacity to serve only about 10% of the 17,600 customers in Whatcom County.

The franchises of the company under which the Whatcom County properties are operated, are not exclusive franchises, and there is no legal obstacle to prevent appellee from operating in the same territory. There is ample room on the highways for appellee to construct another system, which could be built in about a year and a half at a cost not greater than the cost of acquiring the properties in question, according to some of the testimony herein.

On April 18, 1939, the present proceedings were instituted by appellee when it filed in a state court in Washington a petition wherein it was alleged that appellee by Resolution No. 24 had deemed it advisable to condemn the properties in question and that the "public interest, welfare, convenience and necessity require" that appellee acquire the properties in question "in order to conserve the water and power resources of the State of Washington, and in order that said works, plants and facilities may be owned, operated and controlled by" appellee "in the public interest and for the public benefit". Appellee prayed that "the taking of the works, plants and facilities aforesaid, and the damaging, if any, of property incident thereto, be adjudged to be a public necessity and for a public use; that the just compensation to be paid to the" appellants "for such taking and damaging, if any, be determined in the manner provided by law; that upon payment into Court * * * of the amount so awarded, this Court enter a decree of appropriation adjudging and decreeing title to said works, plants and facilities vested in" appellee.

The cause was removed to the court below for determination. Hearing on appellee's application for a decree adjudging the taking to be a public use and necessity was held on July 25 and 26, 1939. The only showing made by appellee regarding "necessity" was the introduction of the resolutions referred to above. There was evidence introduced by the company to the effect that as part of the larger system the properties could be more economically operated, and render better service at cheaper rates. On July 31, 1939, the court below entered a decree that the taking of the properties was for public use and a public necessity. One question presented herein involves the validity of such decree.

Trial of the cause to determine the amount of just compensation to be paid to the company was thereafter had. Aside from the question above mentioned, all questions here involved the correctness of the trial court's rulings during such trial. The facts regarding each question will be later stated. The jury returned a verdict of $5,000,000. Judgment was entered for that sum with interest.

## Public Use and Necessity

The statute quoted above provides that public utility districts shall exercise the right of eminent domain in the same manner and by the same procedure as incorporated cities and towns do under the statutes. 10 Rem.Rev.St. of Wash. §§ 9215–9281 relate to eminent domain by cities. § 9276 provides in part: "Whenever an attempt is made to take private property, for a use alleged to be public under authority of this act, the question whether the contemplated use be really public shall be a judicial question and shall be determined as such by the court before inquiry is had into the question of compensation to be made". § 9215 specifies certain things for which cities may condemn properties under ordinance. § 9217 provides in part: "Whenever any such ordinance shall be passed by the legislative authority of any such city for the making of any improvement authorized by this act or any other improvement that such city is authorized to make, the making of which will *require* that property be taken or damaged *for public use* * * *" (italics supplied). The company contends that by use of the word "require", the legislature intended that the taking must be a "necessity".

In addition to the above statutes, 3 Rem. Rev.St. of Wash. §§ 891–936 also relate to eminent domain. § 925 requires proof of necessity for the taking, by any "corporation authorized by law to appropriate". § 921. The company says these statutes are applicable, but that if not applicable, "necessity" is required to be shown by the statutes previously cited. Appellee contends that the question of "necessity" is not a judicial question but a political one, and that the only judicial question is whether appellee acted "arbitrarily, capriciously, or fraudulently". The company counters by saying that appellee acted in such manner.

■■ We think it is clear that the statutes providing for eminent domain with respect to "corporations" are not applicable here, because those relating to eminent domain for municipal corporations are specifically made applicable by the

act authorizing establishment of public utility districts. With respect to such districts, it was said in State v. Superior Court for Grant County, Wash., 111 P. 2d 577, 582: "The question of the necessity for the taking of relator's property was for the determination of the district commissioners, and with that determination we can have no concern unless it be shown that the commissioners were guilty of fraud or acted arbitrarily and capriciously. * * *" To the same effect is Carstens v. Public Utility District No. 1, Wash., 111 P.2d 583, 590.

■ The company argues that the action of appellee was arbitrary because it was unnecessary to take the properties since other competing lines could be built. The argument, however, ignores the fact that it could reasonably be concluded that it was necessary to take existing properties, thus avoiding competition, rather than to build new lines and be faced with competition. We think a reasonable man could take that view, and that therefore the decision of appellee's commissioners is not arbitrary.

### Just Compensation

During the trial it appeared that the company had a building in Bellingham used as an office building, which would be of little use to it if the properties were taken. The company sought to introduce evidence of MacFadden, a Vice President in general charge of all operations of the company, showing the amount of damage the company would sustain by reason of being left with its Bellingham office building, after the taking of the properties in question. Objection was made and sustained on the ground that MacFadden was giving, not his opinion as owner, but the opinion of experts. Scudder testified concerning such severance damages. He testified as to the fair market value of the building before the taking, and as to the loss in the rental of the building based on its then present use, and the rental value of the property without the company as a prospective tenant, and capitalized the loss in rentals at 6%. His testimony was stricken by the court below. The company contends that these rulings were erroneous.

■ ■ With respect to MacFadden's testimony, we think the ruling of the trial court was correct. MacFadden testified that he had two experts determine the figure for him and that he had "wholly" adopted the expert's figure. The basis of the rule in Washington permitting an owner to testify as to the value of his property, is that the owner is assumed to be familiar enough with the property to know its worth. Weber v. West Seattle Land & Improvement Company, 188 Wash. 512, 63 P.2d 418, 420. Here there is no basis for making the assumption, for MacFadden made it clear that he was not expressing his individual opinion, but that of experts.

With respect to Scudder's testimony, the court ruled as follows: "The Court considers that if it would be proper at all to prove depreciation in the market value of this particular item of the remaining property in connection with determining severance damage that with respect to the testimony in this particular instance it hasn't been done in accordance with the requirement of the rule. There isn't any question but that the measure of damage in respect to severance damage is the difference between the market value of that property not taken and before it was taken and the market value of the same property after the part that was taken became taken. Now, this witness, after apparently qualifying himself as an expert witness on real estate values in this City, in my opinion disqualified himself disestablished his qualification with respect to the depreciation in the market value of this one building, this office building. That is enough in my opinion to make it necessary for the Court to sustain this motion to strike all the testimony of this witness, Mr. Scudder, on the subject of severance damage."

■ By this ruling, the court below meant that Scudder's testimony did not comply with the approved method of proof of damages authorized by the law of Washington in condemnation proceedings. The measure of damages in a case such as this is the fair market value of the property taken together with the amount of depreciation, if any, in the value of the property not taken. Seattle & M. R. Co. v. Roeder, 30 Wash. 244, 70 P. 498, 502, 94 Am.St.Rep. 864; Sultan W. & P. Co. v. Weyerhauser T. Co., 31 Wash. 558, 561, 72 P. 114; City of Seattle v. Lake Union Brick Co., 166 Wash. 278, 6 P.2d 591; 10 Rem.Rev.Stat. of Wash. § 9229. Such depreciation is the difference between the fair market value of the part not taken, prior to the taking, and the fair market value of such part, after the

taking. Idaho & Western R. Co. v. Coey, 73 Wash. 291, 293, 131 P. 810. See, also, Peterson v. Arland, 79 Wash. 679, 692, 141 P. 63.

While Scudder testified as to the fair market value of the building before the taking, he did not testify as to the fair market value of the building after the taking. He did testify as to the loss of rental value but such loss is not the fair "market" value. Whether the rental value "loss" could be used in computing the fair "market" value is a matter requiring the speculation and conjecture of the jury, because it does not directly prove or tend to prove the value required.

With respect to such evidence, the following quotation from Town of Kirkland v. Cochrane, 87 Wash. 528, 151 P. 1082, 1083, is pertinent: "The range of inquiry to be permitted, touching the value of property taken or damaged by eminent domain proceedings, is often a very difficult one, but manifestly there must be some limit to it; otherwise, there would result in most cases unlimited excursions into the field of mere speculation. Hence, when such question arises, there is involved to a considerable extent the discretion of the trial court. * * *"

■ We think, upon the record and the doctrine of Kirkland v. Cochrane, supra, the trial court did not abuse its discretion in striking Scudder's testimony.

■ The Commission of the appellee adopted a resolution agreeing to purchase electricity from the company for a period of five years. Appellee sought to introduce it after it had closed its case in chief. The court below permitted the case to be reopened and the evidence admitted. It was designed to show that the company would not have so much loss from the taking away of its customers. The company contends that the trial court's action was erroneous.

■ ■ Evidence of this nature is admissible. Puget Sound Power & Light Co. v. City of Puyallup, 9 Cir., 51 F.2d 688, 696. Compare State ex rel. Peabody v. Superior Court, 77 Wash. 593, 138 P. 277. However, the danger lies in the possibility, urged by the company here, that the offer is not made in good faith. If the offer was actually made in good faith, it is to be considered in determining the severance damages. In considering whether or not the offer was made in good faith, there were, among others, certain circumstances to be considered: the offer was made after these proceedings were commenced; what sources of power supply are available to appellee other than the company; and the cost, and the length of time required for construction, of facilities for supply of power.

■ ■ However, it is apparent that all these matters bear on the effect or weight of the evidence, a matter of which the jury was the exclusive judge. While it might have been proper for the trial court to give a cautionary instruction, the company requested none, and it cannot now urge error in that respect.

The remaining questions arise from instructions given, or requested but refused.

■ ■ In determining market value of property, it is proper, if not necessary, to give consideration to the present cost of reproducing such property. The company introduced evidence to show the cost of reproduction, if reproduced by a general contractor, and included in such amount the cost of the contractor's bond and an amount for his profit. The first challenged instruction was to the effect that such items should be included "only where the general contractor if employed would effect corresponding savings to the owner on material and labor costs". The company contends that the items were properly a part of the cost of doing the work by the contractor.

Whether or not such an instruction would be valid in other cases, it is unnecessary here to decide. The instruction was based on the testimony of the company's witness Veatch, who testified on cross-examination as follows:

"Q. In a case of this kind would the only excuse for introducing a general contractor be that the result of having him would be to at least make a sufficient saving in overhead costs or unit costs to justify his introduction into the picture? A. Yes, sir, and I would like to qualify—

"Q. He would have to pay his way, otherwise he wouldn't belong in there? A. I think I can answer that 'yes' and I should like to qualify it to this extent, that the plan used in making the appraisal has been one which in my opinion would give to the owner the most reasonable cost so far as the reproduction of the property at

this time would be, and that is the reason."

The trial court, no doubt, attempted to follow the quoted evidence, and we think no reversible error can be predicated on its action. Compare: National Bank of Commerce v. United States, 9 Cir., 224 F. 679, 683; Southern Pac. Co. v. Schwartz, 9 Cir., 89 F.2d 192, 194.

While it might be argued that the court below did not follow the above quoted testimony in its instruction because such instruction mentions savings in labor and material costs, but not in general overhead costs and similar charges, the jury was directed to consider such items in the preceding instruction. Furthermore no objection on that ground was made by the company. Federal Rules of Civil Procedure, Rule 51, 28 U.S.C.A. following section 723c.

There was considerable testimony of witnesses to the effect that in their consideration of the market value of the properties, they gave consideration to the fact that the company's rates were subject to regulation by the Washington Department of Public Service. Early in its instructions, the trial court told the jury that the company's rates and charges were subject to such regulation. Later, the court gave the following instruction: "The market value of property is neither to be enhanced nor diminished by any remote possibility that some favorable or unfavorable event or action may perhaps take place in the future. Accordingly, you should not take into consideration any future event or condition, the occurrence of which is not fairly shown by the evidence to be reasonably probable. Future events which might affect market value if they did occur, and the occurrence of which are within the realm of possibility, are not to be considered in determining present market value unless you believe that the evidence fairly establishes that it is now reasonably probable that they will occur at such not too distant time in the future. But you are entitled to consider such future events which, under the evidence, are reasonably probable in the not too distant future."

Subsequently, the court, in summing up, told the jury that in reaching its conclusion as to the fair cash market value, it "should try to look at the problems with the joint eyes of a willing buyer who is not compelled to buy and a willing seller who is not compelled to sell" and that in other words the jury "should consider what conclusions such a buyer and such a seller would come to". Thereafter, the court asked a series of ten questions to illustrate such statement. Among them were the following: "What consideration would they give to the present and prospective earnings of the properties involved in this proceeding? What consideration would they give to the fact that the properties are what are known as a regulated utility and to the fact that the rates and earnings are subject to State regulation? What would be their conclusions as to the amount of future earnings that with reasonable probability will be allowed by the State Department of Public Service?"

The company contends that the jury were thus permitted to speculate as to the future action of the state regulatory body with respect to rates. The company requested the court to instruct the jury to the effect that the jury "shall assume" that the company's earnings were under reasonable rates. It contends that such instruction would have eliminated the entire matter of rate regulation "which is obviously beyond the scope of the issues", and that the compensation to be paid it "is neither to be enhanced nor diminished by any remote possibility that some favorable or unfavorable action may take place in the future".

We think the company's argument is unsound. The trial court's previous instruction eliminated any possible "speculation" by the jury.

The third challenged instruction followed an instruction that in determining the present fair cash market value of the property, consideration was to be given "to the present and prospective future earnings" of such properties. The court then instructed: "You are not, however, to arrive at their fair cash market value *solely* by a capitalization of present earnings, at some assumed interest rate". The trial court subsequently recalled the jury and struck the word "solely". The company contends that the jury was prevented from capitalizing earnings. Appellee contends that since no capitalized earning value was testified to, the instruction was proper.

We believe the instruction was not erroneous. The court, early in its instructions had directed the jury to consider all elements shown by the evidence which a willing seller and a willing buyer probably would consider in reaching an agreement as to sale price. The particular reason for striking the word "solely" is not specifically

made known by the record, but we believe the purpose of the instruction was to direct the jury not to arrive at the fair market value by capitalizing earnings at some "assumed" interest rate. The jury was, in effect, told that they were not to "assume" an interest rate for capitalization of earnings, and we think there is no valid objection to such an instruction. The same may be said for the instruction directing the jury not to capitalize losses at an "assumed" interest rate. The jury should not be permitted to "assume" an interest rate, but should determine a proper one under the evidence.

■ The fourth challenged instruction was to the effect that appellee was authorized to enter into contracts for the purchase of power, and that any contract entered into by appellee would be binding on it, subject only to the authority of the state regulatory body to revise the rate if it found the agreed rate to be unreasonable, or to terminate such contract after "hearing" if it found that "legal cause" existed for termination. The company requested instructions to the effect that the state regulatory body might terminate such contract in "its discretion".

The basis of the company's objection to this instruction is a statute (§ 10370) which provides in part that nothing in the act shall be construed to prevent an electrical company from continuing to furnish service under any contract " * * * in force at the date this act takes effect at the rates fixed in such contract or contracts: Provided, That the department of public works shall have power, in its discretion, to direct by order that such contract or contracts shall be terminated by the company party thereto and thereupon such contract or contracts shall be terminated by such company as and when directed by such order". The company contends that pursuant to this statute, the regulatory body might terminate the contract "in its discretion" without hearing, and without legal cause, and the instruction was therefore erroneous because it read to the contrary.

■ Assuming, without so deciding, that the quoted statute is applicable here, we think the term "discretion" as used therein means "legal" discretion, requiring a hearing (State v. Public Service Commission, 83 Wash. 130, 145 P. 215, 218) and preventing arbitrary action. The trial court merely stated the same thing in different form, and we believe no error occurred.

The company further contends that the instruction was erroneous because such a contract would not be binding on appellee, and relies on State v. Superior Court For Grant County, supra, 111 P.2d 581. While it is true that the court there said that "the district could not be bound to accept the electric energy from relator for an indefinite period of time", we think the statement was based on the fact that there the resolution of the district authorizing consummation of a contract, named as the prospective seller a particular company "and/or such other private and public corporations, agencies and persons as may have the same available for sale". The court merely said, in effect, that even if the last quoted language had been eliminated, the proof of severance damages would not be easier because no definite contract had been entered into, and the "possibility that the public utility district might purchase its power from relator should simply be an element to be considered in determining what its damages should be". We think the cited authority does not support the company's contention.

■ Finally error is alleged in the refusal of the trial court to instruct the jury to the effect that appellee would not be bound by its (the jury's) verdict. The company argues that the instruction was necessary because it had a bearing on the good faith of appellee in offering to buy power from the company, and in connection with appellee's original estimate of the cost of acquiring the properties in question—such estimate being $3,250,000.

We think the trial court correctly refused the instruction. The sole issue for the jury's determination was the amount of just compensation to be paid the company. Whether or not appellee would pay the amount fixed had no bearing on that issue. In fact it was wholly immaterial and of no concern to the jury.

With respect to objections to instructions, the following from State ex rel. Puget Sound & W. H. Ry. Co. v. Foster, 84 Wash. 75, 146 P. 154, 155, is pertinent: "* * * It might be possible to discover technical errors in these rulings of the court were we to notice some few expressions therein without reference to the instructions as a whole; but that the learned trial court plainly conveyed to the jury the thought that the ultimate measure of re-

spondents' damages must be the depreciation in the market value of the remaining portion of their farm in addition .to the value of the portions taken seems so plain to us that whatever technical error there may have been in some few expressions of the court, standing alone, it was wholly without prejudice. * * *"

Affirmed.

GARRECHT, Circuit Judge (concurring in the opinion of Judge HANEY),

As to Assigned Errors Nos. 9 and 10

Scudder's testimony relative to the severance damages to the Company's Bellingham office building was stricken by the court upon the ground that Scudder had arrived at the amount of severance damages by an incorrect method, and not in any manner as an expert. The ruling had nothing to do with Scudder's qualifications as a realtor or as to what might be the custom of realtors as to making evaluations of real estate generally because this stricken testimony was not based upon any expert knowledge as a realtor, but was directed to the fact that the figure of $108,-000 severance damages was arrived at by a mathematical calculation made in an improper manner.

While fully concurring with the soundness of what Judge HANEY has said in sustaining this ruling, I wish to go on record, in upholding the action of the trial court, upon an additional ground, also embodied in the motion to strike and inferentially in the ruling.

The motion to strike the testimony of Scudder and MacFadden was based on the further reason that, in accordance with the testimony offered by appellant, the estimated amount of lost earnings had already been used by appellant in its determination of going value and market value of the property to be taken—that is, that the earnings that came by virtue of the fact that this office building was used in these operations is included in this sum of $323,-504.23, which Mr. Veatch and appellants' other market value witnesses all used as the basis for their determination of the going value and market value of the properties sought to be taken. MacFadden testified as to the net earnings of the Company for Whatcom County during the year 1939. He did not deduct from such amount a reasonable rental for the part of the building occupied by the Company rent-free. In other words, if the Company had had to rent that amount of space, its earnings would have been reduced by the amount of the rental. The jury was compelled to take into consideration the amount of the Company's earnings in fixing the compensation for the properties, and thus, of necessity had to include that portion of the earnings which represented . the rental item above mentioned. When Scudder attempted to testify as to the severance damages to the building, he capitalized the loss to the Company of the rental value of the building then occupied by the Company, but which would not be used after the taking. The jury, if the evidence had been admitted, would have considered double rental value—once in the capitalization of earnings, and once in the capitalization of loss. It seems to me that the situation here is squarely within the case of Puget Sound Power & Light Co. v. City of Puyallup, 9 Cir., 51 F.2d 688, 694. The language there used by Judge Wilbur is ample authority to sustain the trial court in striking the testimony of witnesses Scudder and MacFadden:

"In view of the fact that the witness testified fully as to the capitalization of the profits derived from Puyallup system, it was not proper for him to again capitalize the same earning capacity under the name of 'severance damages.'

* * *

"It would perhaps have been better for the parties, after qualifying their witnesses, to have merely asked the basic questions, 'What is the market value of the property taken?' and 'What is the depreciation of the market value of the property retained by reason of its severance from the property taken?' giving the witnesses full opportunity to explain the basis of their valuation. In such case no doubt the same questions would come up on direct and cross examination, for, if it appeared either on direct or cross examination that the witness had pursued a wholly unwarranted course in arriving at his estimate of value, it would be necessary to make correction thereof either by striking out his estimate of the market value or by instructing the jury to disregard that portion of the value due to the erroneous method."

STEPHENS, Circuit Judge (dissenting).

I dissent.

I deem it proper to say that my conclusions on all but two of the errors claimed

by appellants are the same as those of my associates, although I am not in full accord with the reasons given by them.

My dissent is based upon my conviction that by an instruction given the jury the appellants were erroneously deprived of the benefit of Mr. Veatch's testimony as to the element of contractor's profit in his "reproduction new" valuation; and that the Court erroneously struck from the record all of the severance damage testimony relating to the Bellingham office building.

These are substantial items, and if either constitutes error there is no recourse open save reversal.

### Claimed Error No. 2

This concerns a part of the Court's instruction upon the subject of "reproduction new" of the property sought to be taken by these proceedings as evidence in arriving at the fair cash market value of such property.

The relevant part of the instruction is as follows:

"I have also told you that you should take into consideration the estimated cost of reproduction new of the properties. By the cost of reproduction new of a property is meant what it would cost to reconstruct or reproduce new the presently existing units of property under present conditions and at present prices for materials and labor.

* * *

"In connection with the estimated cost of construction and the estimated cost of reproduction new of the properties, and your determination of the fair cash market value thereof, you should take into consideration those items which have been described in the testimony of witnesses and the argument of counsel as 'general overheads' or 'general indirect costs' and 'organization expense'. Among these items are engineering and supervision, law expenditures, injuries and damages, taxes during construction, interest during construction, and miscellaneous construction expenditures and expenses of organization. They are in addition to what have been referred to by witnesses and counsel as 'direct overheads' or 'job overheads' or 'general direct costs'.

"In an estimated cost of reproduction new, allowances for general contractor's profit and cost of his bond should be included only where the general contractor if employed would effect corresponding savings to the owner on material and labor costs, and you should in giving consideration to evidence of any estimated cost of reproduction new studies containing allowances for general contractor's profit and cost of his bond eliminate so much of such allowances, if any, as is not represented by such corresponding savings on material and labor."

The vice of the instruction, according to appellants, is in the statement contained therein that "general contractor's profit and cost of his bond should be included only where the general contractor if employed would effect corresponding savings to the owner on material and labor costs * * *".

In passing I note that appellants have designated their exceptions to this instruction under four separately stated "reasons" and appellee suggests that they are not sufficiently definite to inform the court of the claimed error.

I quote one of the "reasons" as urged by the appellants to the trial court: "It (the criticized instruction) is an incorrect statement of the law. The law is that the witness may use any method of estimating present reproduction cost of the property which in his opinion will produce the most efficient and economical result and that was Mr. Veatch's testimony. Everyone knows that the contractor method of constructing large properties is almost universally used today."

I reject the suggestion that the instruction was not sufficiently excepted to.

It should be noted that the majority opinion fails to meet the question squarely, but decides the point entirely on two grounds, first that the objection was insufficient, and second, that the instruction was based on Mr. Veatch's testimony on cross-examination. To support the second ground of decision, one sentence of Mr. Veatch's testimony is quoted, which, taken alone, would make it appear that the witness had testified that the only excuse for employing a general contractor would be a saving in labor and material costs. I shall presently show that this assumption is improper.

In determining the reproduction new cost of a property, the appraisal may be made on three different assumptions (1) that the construction will be performed by the owner (2) that the work will be done by a general contractor; or (3) a combination of the other two.

One witness for the Company (Mr. Veatch) adopted the general contractor theory in his reproduction new testimony. In his calculations he estimated the total cost of the system and then added 10% for the compensation and expenses and expenses of the general contractor and cost of the contractor's bond. I quote from his testimony:

"* * * I used the plan of reproduction by contract because I feel certain that it would be the plan followed by any prudent company in reproducing the property. Any of the other plans would involve what would be equivalent to the contractor taking his first job and taking the job, the first one, of some five millions dollars of property. I don't believe that would be done by a prudent organization.

* * *

"Q. Did you make any effort at all, Mr. Veatch, to ascertain that (what) the owner of this property might incur in the way of engineering expenses if he sought to set up his own organization? A. Other than the belief based on what experience I have had that the cheapest manner—I don't necessarily mean the cheapest either —I mean the most prudent manner for the owner to handle his work would be to hire a consulting engineering firm to design it and supervise it.

* * *

"The performances used throughout the job have been based on work done by an efficient organization with efficient supervision and by an experienced contractor, and if you make your estimate without the 10% and assume that you are going to build up an organization for its first job to build a five million dollar project, you can't count on the same thoroughness and experience that you would get with an experienced contractor. In other words, the inclusion of 10% is to justify you in assuming performances which a reasonable experienced contractor would give.

* * *

"* * * The main thing, * * * is that this 10% roughly is added to the bare cost of the work to give to the project an organized and experienced construction force and as contrasted with that if you don't plan on a contractor with his profit you plan on setting up what is (in) a sense is a contractor for the first job taking a five million job without any experience, without any equipment and without anything else and building it and no prudent owner would do that.

"Q. * * * Now, wherein in introducing a contractor into this picture have you allowed for any saving that might be made by virtue of the fact that the contractor might bid less than your estimate? A. Well, as stated, I believe that the performances and efficiency of the whole job would justify the 10%. Furthermore, as stated a moment ago, I don't think any prudent owner would build it on that basis.

"* * * I don't know ever in my experience of a company reconstructing at one time five million dollars worth of property on a force account basis. It just isn't done.

* * *

"Q. What allowance would you make or change would you make in these overheads, and for what reason, if you didn't have the general contractor? A. I would certainly increase them.

"Q. Well, what ones and for what reason? What would you cover by the increase? A. Well, you would have to have —instead of the organization that is set up and the administrative offices, and so forth, you would have to include what the contractor would have over and above the field forces which have been included in the crew set up. That organization would have to be added to the organization of the owner that hasn't been included in these overheads.

* * *

"* * * the plan used in making the appraisal has been one which in my opinion would give to the owner the most reasonable cost so far as the reproduction of the property at this time would be, and that is the reason.

* * *

"Q. If the Puget Sound itself was the builder, would your assumption still be that a general contractor would be employed? A. That is my assumption, and it is based on the fact that the company on any of their projects of any size always do it that way.

* * *

"Q. Now, further with respect to this contractor's profit, you have been asked about it, do you know of any private corporation, and base this upon your 31 years experience, do you know of any private corporation organized for the purposes of

operating a property that would do a several million dollar construction project, or has done—we will put it that way—by force account rather than by contract? A. I don't know of any, no.

"Q. Do you know of any organization like private companies which, when it was first organized, launched by force account upon a construction program anywheres near this magnitude? A. I never knew of one, no.

 *   *   *

"Q. *  *  * Now, do you know of any R. E. A. projects, rural electrical administration projects that hasn't been or isn't being constructed by contract rather than by force account? A. I know of none. It is my understanding they are all by contract."

The witness testified that of the 10%, 4% would go for the contractor's general expense, his general office expense, and all of his administrative expenses, with the exception of the definite job costs, and that the remaining 6% would be a reasonable profit.

The Court, however, in effect instructed the jury to disregard all testimony of the witness relating to the advantages of employing a general contractor for the work other than money savings, over the reproduction new cost without a general contractor and told the jury that the cost of reproduction new by contractor could include compensation to the contractor and cost of bond up to but not beyond the savings on material and labor that he was enabled to make over the reproduction new cost without a general contractor.

I am of the opinion that this constitutes reversible error. It takes away from the jury all consideration of the testimony to the effect that no prudent owner would construct the properties otherwise than by general contractor, and this in the face of Mr. Veatch's testimony that it is the universal custom to use a general contractor in all sizable projects. It takes from the jury the question of whether the general contractor method was the only practicable method of construction and would be so considered with all of its elements of cost by the hypothetical willing parties to a purchase and sale.

Claimed Errors Nos. 9 and 10

The Company owns a building in the City of Bellingham, the County Seat of Whatcom County, and a portion of this building is used by the Company in connection with the business side of its activities and a portion of it is rented. This building is not the subject of these eminent domain proceedings, and the Company claims a severance damage. Two witnesses, Mr. S. P. MacFadden, Vice President of the Company, and Mr. O. C. Scudder, a realty dealer in Bellingham, gave testimony upon this issue. After the testimony had been received it was stricken and the appellants claim error.

Both Mr. MacFadden and Mr. Scudder testified that the actual loss in value of the building by reason of the condemnation of the Company's business was $108,000. Mr. MacFadden when questioned as to the market value of the property before the condemnation gave the figure of $231,000 as his estimate.

I quote from the testimony of Mr. Scudder:

"Q. Now, Mr. Scudder, have you been employed by the Puget Sound Power & Light Company to determine the severance damage, if any, which would be sustained by the Company to its Bellingham office building property? A. I have.

"Q. And have you made a study and inspection of the property to assist you in reaching a conclusion? A. I have.

 *   *   *

"Q. Now, have you come to a conclusion as to the severance damage in that respect? A. Yes, sir.

"Q. What in your opinion will be the depreciation or diminution in market value of the Bellingham office building property by reason of the taking by the P. U. D. of Whatcom County system of the Company?

 *   *   * (At this point counsel objected on the ground that it is improper to ask the witness what the severance damage might be without giving the value of the building before and after the severance. The objection was overruled.)

"A. Not less than $108,000.00.

"Q. Now will you explain for us Mr. Scudder, the basis of your conclusion, directing your attention first to the present situation with respect to that building? A. Well, the property in its present use is earning its highest and best possible return.

"Q. First I would like to have you explain the physical situation as it now exists, what character the building is. *  *  * A. Well, the building was built in 1930 *  *  * (At this point the witness

proceeded to describe the building in detail, stating that it was built for a district headquarters building and a sales promotion building, and for that purpose some very unusual features were built into it. He also stated that there was almost no commercial purpose that a large part of the building could be used for other than its present use.) As it sets today, it is * * * a white elephant on the owner's hands if they don't have the present unusual use for it. * * * You can't make it over into an office ·building very readily * * *. The rooms upstairs, * * * due to the type of construction, it would be difficult to .put into condition for office use at a cost that would allow any net return above a return on the cost of remodelling. The ground floor is worse yet. To use it for stores or, shops, which could be done, you would have to drop it to street level. Well, to take out reinforced concrete floors and supporting beams with posts every 12 or 13 feet and try to put that into storerooms, from a practical standpoint it is almost an impossibility."

Mr. Scudder then testified: "The (maximum rental from) the portion used by the company if the present tenancy was severed from it is $350 per month. * * * We have appraised the present use in income value of the portion owned (used) by the company as not less than $950 a month * * *. Well, the difference between $350 and $950, or $600, would be $7,200 a year. We have allowed the company $60 with which to rent an office. to maintain their gas business, which reduces the annual income loss to $6,480, which brings an actual loss in value to the building of $108,000."

On cross-examination Mr. Scudder testified that he had arrived at the $108,000 figure by capitalizing the $6,480 at 6%. On redirect examination he testified that the method followed by him in determining the severance damage and the diminution in market value was "a method generally followed by members of (his) real estate profession."

At the conclusion of Mr. Scudder's testimony on this subject the appellee moved to strike his testimony, whereupon the Court ruled that the witness "after apparently qualifying himself as an expert witness on real estate values in this City, in my opinion disqualified himself disestablished his qualification with respect to the depreciation in the market value of this one building, this office building". The entire testimony of Mr. Scudder on the question of severance damages to the office building was stricken from the record.

It should be noted at this point that Mr. Scudder had testified that he had been in the real estate business in Bellingham for more than 20 years and was generally familiar with the market value of real estate in Whatcom County. No ·question was made as to his general qualification as an expert, the Court apparently basing its conclusion as to his disqualification to testify in regard to this one building on the method used in arriving at his estimate of diminution in value. The qualifications of the witness are beyond attack. It is plain to be seen that the Court thought evidence of the method used in regard to the severance damage as to the building was inadmissible. , Entertaining this view it was of course the Court's duty to rid the record of it. This the Court did and it is our function here to determine the right or wrong of this action uncomplicated with the course the Court took as to disqualification of the witness.

It is argued before the Trial Court that it was improper in the first instance to allow the witness to state how much, in his opinion, the land would be depreciated in value on account of the condemnation of the Company's properties, the contention being that the amount of damages was for the jury to determine—that the sole function of the witness was to state the market value of the property before and after the condemnation, and allow the jury to make the mathematical computation. The Court overruled the objection, and properly so, in view of the Washington law on the subject. See Seattle & M. Ry. Co. v. Gilchrist, 4 Wash. 509, 30 P. 738, 739; Ingram v. Wishkah Boom Co., 35 Wash. 191, 77 P. 34; and King County v. Joyce, 96 Wash. 520, 165 P. 399.

I quote from the Gilchrist case, supra [4 Wash. 509, 30 P. 739]: "It is also objected that one of the respondents was permitted to state how much, in his opinion, the land would be depreciated in value on account of the appropriation of the right of way and the construction of the railroad. It is conceded by appellant that it is competent for a witness, if properly qualified, to state his opinion as to the value of the land before and after the appropriation; but it is contended that it is for the jury to say what the damages are, and

not the witness. While there is undoubtedly a conflict of authority upon this question, it seems difficult to perceive any substantial reason for rejecting such testimony. To admit evidence of the value of the land before and after the taking is to admit, in effect, the same thing to be done which appellant complains of, since the amount of the damages is then ascertained by the jury by the mere process of subtraction. And, this being so, we are unable to understand, why the witness should not be permitted to state the result, as well as the facts from which such result is reached. In either case, the amount of the damages is ultimately based on the opinion of the witness. The distinction here insisted on between the two methods is based on mere form, rather than substance. The facts upon which the witness bases his opinion may be shown on cross-examination, and when this is done the jury have all the means which can be afforded for forming an independent judgment as to the damages."

It therefore seems clear that the witness's testimony as to his estimate of diminution in value was admissible. The question then arises, was the Court justified in striking the testimony in view of the method used in determining the figure given by the witness?

In my opinion the Court committed error in so doing. The witness laid the foundation that it was the custom of realtors in the Bellingham district to use this method in checking for market value. It is too restricted a view of Mr. Scudder's testimony to hold that the capitalization of rental losses was taken by him without regard to other elements that might reasonably be taken into consideration as affecting market value before and after the severance. His testimony very definitely points to the unusual features of the building and to the fact that they adversely affect its use and its marketability. In fact he went so far as to say that it was unsalable and that the actual severance damage was far in excess of the figure resulting from the capitalization method that resulted in the figure $108,000.

To hold that the expected income from a property cannot be figured in terms of interest return on the investment as an element in the ascertainment of the property's normal market value is to exclude a basic element of the capitalistic theory of valuation.

In Niagara, Lockport & Ontario Power Co. v. Horton, 231 App.Div. 402, 247 N.Y.S. 761, 764, the Court was concerned with eminent domain proceedings in the State of New York. One witness qualified as an expert on land values and gave as his opinion that the land had a market value of $269,000. On cross-examination the witness told how he arrived at his valuation, which was by determining the net income to be derived from such a plant and capitalizing this amount and then awarding to the defendants a proportionate share. I quote from the opinion of the Court:

"The commissioners concluded that the witness had adopted an erroneous theory of damages and struck out, not only his answers that the land in question had a market value of $269,000, but all of his testimony. This was error. * * *

"Defendants are not entitled to a valuation mathematically fixed and determined by the proportionate contribution of their land to a completed plant * * *.

"But defendants are entitled to the fair market value of their land for its highest and best available use. * * *

"And when a witness, duly qualified as an expert, to give evidence on the question of value, gave his opinion as to value, his evidence should not have been stricken out, but should have been considered for what it was worth, in view of all that he said in regard to the method by which he arrived at his conclusion, and keeping in mind the true measure of damages. * * * *"

Mr. Scudder's testimony should not have been stricken.

Mr. MacFadden did not qualify as a realty expert, but was offered as a witness on the theory that as Vice President in general charge of all operations of the Company he occupied the position of owner and therefore need not otherwise qualify in order to give testimony with respect to the severance damages.

There is no doubt that under the Washington law Mr. MacFadden was in the position of an owner by virtue of his position in the Company. See Weber v. West Seattle Land & Improvement Co., 188 Wash. 512, 63 P.2d 418.

Mr. MacFadden admitted on the witness stand that he had been assisted in making his determination of value by the computations of Mr. Scudder and Mr.

Wright, another realty expert. I quote from the testimony of Mr. MacFadden:

"Q. Mr. MacFadden, what information did you have to assist you in arriving at this one hundred and eight some odd thousand dollar figure? A. I had two competent Bellingham real estate men determine the figure of $108,000 for me, *and after going over it, I agreed that it was the proper figure.*

"Q. Who were these men? A. Mr. Scudder and Mr. Wright.

(The record does not reveal that Mr. Wright testified as to his method of arriving at severance damages.)

* * *

"Q. And is the figure that you used the figure that they gave you? A. Yes, sir, $108,000.

"Q. You have adopted it wholly? A. Yes, sir.

"Q. Does that serve as the basis of your opinion? A. Yes, sir, *that and my knowledge of the situation."* (Emphasis supplied.)

In sustaining a motion to strike Mr. MacFadden's testimony on the subject, the Court ruled that the witness had not testified as an owner, but "is stating that because somebody, some expert witnesses, told him that".

By this ruling the Court fell into error. The witness testified that he based his estimate on his own knowledge of the situation, as well as the advice of the experts. And what I have said about the testimony of Scudder applies as well to that of MacFadden. The stricken testimony should have gone to the jury for what it was worth.

The majority in affirming the action of the trial court in striking MacFadden's testimony, take only a part of his testimony and give it a meaning that it cannot have in its real context.

After the justification of the striking of MacFadden's severance damage testimony in this erroneous manner, the majority proceed to justify the striking of Scudder's severance damage testimony, but not upon the ground that severance is improper nor upon the ground that the witness was in any way disqualified. The majority opinion takes the view that "while Scudder testified as to the fair market value of the building before the taking, he did not testify as to the fair market value of the building after the taking. He did tes-

tify as to the loss of rental value but such loss is not the fair 'market' value. Whether the rental value 'loss' could be used in computing the fair 'market' value is a matter requiring the speculation and conjecture of the jury, because it does not directly prove or tend to prove the value required".

But this theory overlooks the testimony of Scudder which I have quoted above to the effect that in his opinion the property would be damaged in the sum of $108,000 by the severance. The testimony as to rental value loss was merely explanatory of the witness's method of arriving at that $108,000 figure. I can see nothing in the record to justify an assumption that the Washington measure of damages as quoted in the majority opinion, "the fair market value of the property taken together with the amount of depreciation, if any, in the value of the property not taken" was not fully followed.

Judge GARRECHT in his concurring opinion further justifies the striking of Scudder's entire severance damage testimony upon the ground that an omission occurred in MacFadden's testimony as to the Company's income. The equation is this: The Company housed its offices in the building but did not charge itself rental. That this would require that the net income should be decreased in an amount equal to such rental value. Therefore it follows the severance damage would be "double rental value". Here is as plain a non sequitur as one could ever find and can only be accounted for by arriving at the conclusion that my associate was in some manner misled as to the use the *income* testimony could be and was put to in the case. Assuming the correctness of the premise that the omission of a rental charge was left without proper explanation in MacFadden's testimony, a premise which I shall presently show does not exist, it could not be an offset to severance damage any more than three apples could be taken from five pears.

Judge Wilbur in Puget Sound Power & Light Co. v. City of Puyallup, 9 Cir., 51 F.2d 688, 695, in defining "the fundamental questions involved" in this kind of an eminent domain case, said they were "the ascertainment of the market value of the property taken plus the depreciation of the market value of the property retained". In the Puyallup case it was sought by the Company to get the full

market value of the property taken and to top this with a sum which capitalized would produce the profit to the company about the same as though it had never sold the property taken by condemnation—a classic example of trying to eat the cake and have it too. This claim was incorrectly called severance damage to the whole system. Judge Wilbur very properly held that this *profit* which was sought to be awarded under the term of severance damage was an item already taken into consideration in the fair market value of the property taken. No such situation appears in the instant case. No general severance damage to the Company system is sought. The severance damage to the building alone is sought more on the idle plant theory which was mentioned but not claimed in the Puyallup case.

Now, let us return to the claim that the failure to charge itself rental was an exact offset to the building severance damage (which of course it was not and could not have been). The whole matter was called to the attention of the jury and the jury will be presumed to have considered and justly to have adjusted the *income* figure accordingly. Then when the severance damage evidence came in the jury should have been allowed to consider it the same as any other proper evidence. How could it be clearer that this puts the *doubling* as against the Company rather than as against the District.

It would seem that this might be enough but there is much more.

My associate has erroneously assumed that the figure of net income is a definite item in the judgment amount and that if this figure is overstated the judgment award should be deducted by such overcharge and that the court may look for any item in the testimony and strike it out as a correction.

The net income is not such a definite item, it is but one important item among many others going to make up the estima-

tion of the *going concern value* attributable to the property taken.

Mr. MacFadden, in being cross examined upon his testimony as to fair market value, was asked the following question, "This element of going concern value as you have appraised it or estimated it takes into consideration the earning ability of the company?", to which the witness answered, "That is one element, yes, sir.". Question, "Well, it takes into consideration that element?". Answer, "That is one of the things considered." Question, "I appreciate that there may be other things, but that thing itself is considered?" Answer, "Yes, sir."

I quote from the cross-examination of another Company witness, W. C. Gilman: "In arriving at market value, in my opinion it is not possible to put a price tag on each particular factor. I have given consideration to the earnings of the enterprise in Whatcom County, testimony as to reproduction new and depreciation—those might be called facts. There are other intangible factors such as my opinion as to the possibilities of this territory, the present earning power and the reason of the prospective earning powers. Those are intangible. Those are all elements, however, which go to make up value. It is impossible to weigh them in terms of percentages. Market values and prices are not arrived at that way."

But the factual premise of my associate on this point is palpably erroneous. There was no omission of rental charge that was not thoroughly given the jury for its adjustment as heretofore mentioned.

My associate states: "The jury, if the evidence had been admitted, would have considered double rental value—once in the capitalization of earnings, and once in the capitalization of loss". There is nothing in the record to substantiate the assumption that valuation would be arrived at by capitalization of earnings.

In my opinion the judgment should be reversed.